**FEDERAL SURETY CO. v. STATE ex rel. WALCOTT, Bank Com'r, et al.**

No. 15740—Opinion Filed Jan. 12, 1926.

Rehearing Denied Feb. 23, 1926.

1. **Principal and Surety—Liability on Bond of Bank Cashier for Cashing Worthless Checks.**

When J. B. draws an order on the bank of P. directing the bank to pay to a third person a sum of money out of the funds of the bank, and the cashier of the bank of P. cashes such order, and pays out the sum of the face of the order, or cancels notes of such third person held by the bank of P., and thereby releases such third person from his obligation to the bank, and at the time of paying out, or cashing such order, J. B. has not on deposit with such bank a sum equal to such order, the surety on the official bond of such cashier is liable for the sum or sums so paid out under section 4143, C. O. S. 1921.

2. **Same—Terms of Bond—"Willful Misapplication."**

When the terms of a cashier's bond recite that the surety indemnifies a bank against the "willful misapplication" of the funds of the bank by its cashier, such surety on the cashier's official bond is liable where the cashier pays out money of the bank upon worthless orders, checks, or drafts, knowing, as it is his duty to know, that the drawer of such orders, checks, or drafts, has not on deposit with such bank a sum equal to the sum of the order, checks, or drafts, such acts constituting a willful misapplication of the funds of such bank.

(Syllabus by Ruth, C.)

Commissioners' Opinion, Division No. 3.

Error from District Court, Mayes County; A. C. Brewster, Judge.

Action by the State of Oklahoma on relation of Roy Walcott, Bank Commissioner, and the First State Bank of Vinita against the Federal Surety Company. Judgment for plaintiffs, and defendant appeals. Affirmed.

Ross & Thurman, for plaintiff in error.

J. T. McIntosh, for Bank Commissioner.

Carey Caldwell, for defendant in error.

Opinion by RUTH, C. This action was brought by the defendants in error to recover from the plaintiff in error a sum of money, being the money of the First State Bank of Pensacola, Okla., and alleged to have been misapplied by one Sherman William Brown, cashier of the last said bank. It appears S. W. Brown was cashier of the First State Bank of Pensacola, and the Federal Surety Company was surety on his bond. The condition of the bond was as follows:

"We * * * bind ourselves to pay to First State Bank of Pensacola, Okla., * * * such pecuniary loss * * * as the employer shall have sustained * * * by any act or acts of fraud, dishonesty, forgery, theft, larceny, embezzlement, wrongful abstraction or willful misapplication."

The foregoing is the only portion of the bond set forth or referred to in the record or the briefs.

After S. W. Brown became cashier of the Pensacola Bank, his brother, J. J. Brown, opened up a grain elevator in Pensacola, and would purchase grain from the farmers in that vicinity and give what is called a "bill of exchange," but in reality a check, on the First State Bank of Pensacola, for the purchase price of the grain, and these checks would be presented at the bank and cashed by S. W. Brown, notwithstanding J. J. Brown did not have a deposit in the bank sufficient to pay these checks, and in fact was "in the red" the major portion of the time during these transactions. There were some 40 of these "bills of exchange" or checks of J. J. Brown, cashed by S. W. Brown, identical in form, and it will be necessary to set out but one as follows:

"Bill of Exchange.

"First State Bank, Pensacola, Okla. 11-17-21.

"On demand pay to the order of A. R. Jones, $70.54. Seventy and 54-100 Dollars. "Gross 20,470 lbs. Kind of grain A. R. Jones.

"Tare    918 lbs.        Oats
"Net    11,285 lbs.

"To John J. Brown, Pensacola, Oklahoma. "Accepted—Pensacola, Oklahoma 11-17-21.

"John J. Brown, by J. J. Brown."

Some 40 of these worthless checks were cashed by S. W. Brown, cashier, out of the funds of the First State Bank of Pensacola, notwithstanding J. J. Brown had no money in the bank and during the greater portion of the time J. J. Brown's account was actually overdrawn.

The bank became insolvent and was closed by the Bank Examiner, who, under order of the court, turned over the assets of the defunct bank to the First State Bank of Vinita under an agreement which it is not necessary to discuss in this opinion.

The plaintiff in error contends that these acts on the part of S. W. Brown do not constitute breaches of duty on the part of S. W. Brown, or breaches of the conditions of the bond executed by Federal Surety.

Company, as surety, and further contends that even if the transactions complained of were in fact breaches of duty on the part of S. W. Brown, and breaches of the conditions of the bond, there can be no recovery on account thereof, because the proof failed to show that the First State Bank of Pensacola, or the plaintiffs, or either of them, were damaged thereby. With this we cannot agree. The evidence discloses S. W. Brown did pay out some cash on these checks, and it further appeared there were some 30 different farmers to whom these checks were given, and a number of these farmers were indebted to the bank and the bank held their notes for the amounts, and when a farmer who was indebted to the bank presented one of J. J. Brown's worthless checks, the brother, S. W. Brown, would credit the farmer's notes with the amount of the check and charge the check against the account of J. J. Brown, who, as already stated, had no money in the bank to meet these checks. By thus manipulating the accounts, S. W. Brown was transferring the indebtedness to the bank from the shoulders of some 30 farmers, who were raising crops each year, to the shoulders of his brother, who, so far as the record shows, was wholly insolvent and was becoming more and more involved each day, and was conducting a losing business from the time he took over the elevator until the bank was closed. There is nothing in the record to show any one of these 30 farmers was insolvent, or that the amounts owed by them to the bank could not have been collected, and the bank would certainly have been in a better position to have collected from 30 farmers, than it was to have collected the total amount from the insolvent J. J. Brown.

Section 4143, C. O. S. 1921, provides as follows:

"Any bank, officer, or employee, who shall pay out of the funds of any bank upon the check, order or draft of any individual, firm, corporation or association which has not on deposit with such bank a sum equal to such check, order or draft, shall be personally liable to such bank for the amount so paid and such liability shall be covered by his official bond."

It is immaterial by what name J. J. Brown designated the order on the bank to pay the money to these 30 farmers, whether he called them bills of exchange, checks, drafts, or whatnot, the fact remains that it was an order on the First State Bank of Pensacola to pay the amounts named in the orders, and the brother, S. W. Brown, as cashier of the bank, paid these checks or orders as presented, knowing them to be worthless and knowing J. J. Brown did not have money in the bank to his credit to pay the same.

The surety company insists that as the trial court found the cashier did not personally profit by any of the transactions, there was no fraud committed, and therefore it should be absolved from liability on the bond. The contention is without merit, as the statute, section 4143, C. O. S. 1921, supra, does not refer to fraud, but provides that the surety on the bond shall be liable if the principal pays out any of the funds of the bank upon any "order," etc., of one who has not sufficient money in the bank to meet and pay such order.

It is not denied, and it is in fact admitted by the cashier, that he did so pay out the money of the bank, both by parting with the actual cash of the bank and by canceling what might have been perfectly good securities, to wit, the farmers' notes, and receiving nothing in exchange therefor, as J. J. Brown did not even give the bank his note to cover the amount of the orders, nor did he, so far as the record discloses, ever orally promise to repay the bank; nor did he direct the amount of the orders be charged to his account, and for the very good reason that his "account" was usually overdrawn.

It is contended the bond did not cover such proceeding or action on the part of the cashier, but by an examination of the condition of the bond, as hereinbefore set forth, it will be observed the bond specifically insures against "wrongful abstraction or willful misapplication" of the funds of the bank, and under the admitted facts in this case, the acts of the cashier constitute a willful misapplication of the funds of the bank for which the surety on the official bond of the cashier is liable.

For the second cause of action, it appears one A. D. Harrison, who was a brother-in-law of S. W. Brown, the cashier, drew a check on the First State Bank of Pensacola, but having no account with the bank, S. W. Brown refused to pay the check, and S. W. Brown's wife, a sister of A. D. Harrison, called her other brother, W. M. Harrison, and obtained his permission to have the check charged to his account, which was accordingly done, and the cash paid to A. D. Harrison and charged against the account of W. M. Harrison, and then S. W. Brown drew a draft on A. D. Harrison through the First State Bank of Pensacola, and credited the amount to the account of W. M. Harrison, knowing full well the draft would not be honored as A. D. Harrison had no funds, and after the draft

was so "turned down," the accommodating cashier, brother-in-law of the Harrisons, carried the worthless draft as a cash item, and the record discloses that when W. M. Harrison, brother and brother-in-law, respectively, of A. D. Harrison and S. W. Brown, was so liberal in having the $100 check charged to his account, he, W. M. Harrison, was $144.96 overdrawn or "in the red," and this sum was a total loss to the bank and its depositors.

The third cause of action involved the misapplication of $150 of the funds of the insolvent bank. It appears that A. D. Harrison drew a draft for $150 on the McDaniel National Bank of Springfield, Mo., through the First State Bank of Pensacola. S. W. Brown, the cashier, cashed this draft, forwarded the same to the Springfield bank, where it was immediately dishonored and returned to the Pensacola Bank, and the cashier, S. W. Brown, carried it in the cash items of the bank and as part of its assets.

When the Pensacola Bank was taken over by the Bank Commissioner of Oklahoma, there was found to be cash on hand to the extent of $6.62, and the record fails to disclose whether this sum was left there designedly or was overlooked by the Browns and Harrisons, but with this phase of the situation, we are not called upon to deal.

Neither the brief of the plaintiffs nor defendants in error cites any case directly on the points contended for, and we have been unable to find any case in this state where this court has been called upon to pass upon this particular and peculiar manipulation of the funds of a bank, but from the record, it is beyond question, and we so hold, that these transactions constituted a "willful misapplication" of the funds of the bank as specifically provided against by the terms of the bond, and the transactions were such as to make the surety liable under section 4148, supra. Judgment was rendered against the defendant surety company in the sum of $879.18, and finding no error in the record, the judgment of the trial court is affirmed.

By the Court: It is so ordered.

Note.—See under (1, 2) 7 C. J. p. 525 § 127 (Anno).